# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                    No. 1:14-CR-03604 MV

FIRAS ABUZUHRIEH,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Mr. Abuzuhrieh's Objections to the Pre-Sentence Investigation Report ("PSR") [Doc. 154], and Mr. Abuzuhrieh's Sealed Sentencing Memorandum, [Doc. 155], both filed on September 29, 2016. The United States responded to Mr. Abuzuhrieh's Objections on November 3, 2016, [Doc. 169], and Mr. Abuzuhrieh replied on December 30, 2016, [Doc. 177]. This Court held an evidentiary hearing on January 18, 2017, to hear expert testimony pertaining to Mr. Abuzuhrieh's first objection. [Doc. 182]. The parties submitted briefs following the evidentiary hearing. [Docs. 183, 184, 185]. The Court, having considered the PSR, Objections, briefs, relevant law, and expert testimony, and being otherwise fully informed, finds that Mr. Abuzuhrieh's Objections are well taken in part and will be sustained in part. Furthermore, in considering the sentencing factors under 18 U.S.C. § 3553(a), the Court finds that a sentence within the Guidelines range would be "greater than necessary" and that a downward variance is warranted.

## BACKGROUND

Mr. Abuzuhrieh was tried and convicted of crimes involving "spice," or products containing synthetic cannabinoid chemicals. The following facts were elicited at trial and/or

attested in Mr. Abuzuhrieh's Sentencing Memorandum or the PSR. Mr. Abuzuhrieh was born in 1977 and grew up in the Palestinian neighborhood of Beit Hanina, in East Jerusalem, amidst violent conflict and limited opportunities for Palestinian youth. [Docs. 146 at 3; 155 at 6]. In September 2001, in his mid-twenties, Mr. Abuzuhrieh and his wife and young son moved to the United States for a more stable life and to raise their family. *Id*. at 7. They moved to Albuquerque to join Mr. Abuzuhrieh's brother, who owned a small grocery store. *Id*. Mr. Abuzuhrieh worked at his brother's store while saving money to open his own store. *Id*. From 2009–2011, Mr. Abuzuhrieh ran his own grocery store in Albuquerque, but had to close the store when it did not make enough money. *Id*. at 8. Mr. Abuzuhrieh returned to work for his brother until sometime in late 2012 or early 2013, when he acquired the "Ace Smoke Shop & Grocery" in Moriarty, New Mexico, later moving the store to Albuquerque's Northeast Heights neighborhood. *Id*. at 9–10.

In addition to selling a variety of legal smoke shop items, Mr. Abuzuhrieh also sold "spice" or "potpourri" out of his shop. [Doc. 133 at 146]. The term "spice" refers to a product made by applying a synthetic cannabinoid chemical to inert plant material, giving users a similar psychedelic experience to using marijuana without testing positive for marijuana in a drug test. [Doc. 182 at 7–8, 21–22]. Spice is also colloquially known and often labeled as "potpourri." Mr. Abuzuhrieh started selling spice when he began his smoke shop business. Two of the substances at issue in this case, XLR-11 and UR-144, were emergency scheduled on May 16, 2013; the third substance at issue, 5F-PB-22, was emergency scheduled on February 10, 2014. All three substances are Schedule I synthetic cannabinoid drugs.

Drug Enforcement Agency (DEA) officials made two undercover purchases at Mr. Abuzuhrieh's store. One was made on August 14, 2014, from Mr. Abuzuhrieh's employee,

Islam Kandil, and one was made on August 18, 2014, from Mr. Abuzuhrieh. [Doc. 132 at 31–38; 45–54]. In both instances, the undercover agent asked for spice by requesting "1.5s," and both Mr. Kandil and Mr. Abuzuhrieh during their respective sales reached into a drawer under the cash register, hidden from customer view, to pull out the packets of spice for sale. *Id*. The spice in both purchases tested positive for XLR-11. [Doc. 75]. The undercover and arresting agents testified at trial that there were no spice products or advertisements for spice on display in the store. [Docs. 132 at 30; 133 at 18].

On September 22, 2014, Mr. Abuzuhrieh was arrested at his shop and, after waiving his rights, admitted to selling spice. [Doc. 133 at 32]. The shop was searched pursuant to a search warrant, and around one kilogram of spice was seized from Mr. Abuzuhrieh's shop. [Doc. 146 at 5]. Furthermore, a property manager happened to arrive during Mr. Abuzuhrieh's arrest, and he asked DEA agents whether he could obtain a key that Mr. Abuzuhrieh had to another unit in the building, Suite H, explaining that Mr. Abuzuhrieh had been renting Suite H and that he possessed the only key to the unit. [Doc. 132 at 136–42]. After Mr. Abuzuhrieh gave agents permission to search Suite H, agents seized a substantially larger supply of spice. [Doc. 154 at 19]. In total, 62 kg of spice were seized. [Doc. 146 at 5]. Officers did not find any pure synthetic cannabinoid chemical.

On July 14, 2015, a six-count Superseding Indictment was filed, charging Mr. Abuzuhrieh in Counts 1 (Conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1)), 3 (Distribution of XLR-11, in violation of § 841(a)(1)), 4 (Possession With Intent to Distribute XLR-11, in violation of § 841(a)(1)), 5 (Possession With Intent to Distribute UR-144, in violation of § 841(a)(1)), and 6 (Possession With Intent to Distribute 5F-PB-22, in violation of § 841(a)(1)). [Doc. 75].

At trial, Mr. Abuzuhrieh testified in his defense that he was not aware until after his arrest that the spice he had been selling was illegal under federal law. [Doc. 133 at 188]. He testified that at the time he was looking to start selling spice, he had researched spice online and seen on multiple websites that spice was "100% legal." [Doc. 133 at 151–55]. Mr. Abuzuhrieh also testified that although two members of his family had run-ins with law enforcement over their sale of spice, Mr. Abuzuhrieh had not known that the spice he was selling contained federally controlled substances. [Doc. 133 at 206–09, 215–18]. Nevertheless, after a four-day jury trial, Mr. Abuzuhrieh was convicted of all counts.

The PSR submitted by the United States Probation Officer recommends a base offense level of 34 and a total offense level of 40. [Doc. 146 at 7]. The PSR arrives at the base offense level by citing the drug quantity seized in this case as 62 kg. Because the controlled substances in this case are not listed on the Drug Quantity Table, U.S.S.G. § 2D1.1, the PSR consults the Drug Equivalency Tables in the Guidelines and equates the substances at issue to the same weight of tetrahydrocannabinol ("THC"), which is the psychoactive ingredient in marijuana. [Doc. 146 at 6–7 (citing U.S.S.G. § 2D1.1 cmt. n.8(D))]. According to the Drug Equivalency Tables, one gram of THC is equivalent to 167 grams of marijuana. Multiplying the 62 kg at issue by 167, the PSR states that the total drug quantity attributable to Mr. Abuzuhrieh for sentencing purposes is 10,354 kg of marijuana, making his base offense level 34.

The PSR also calls for two-level enhancements for each of the following, bringing the total offense level in the PSR to 40: (1) maintaining a premises for the purpose of distributing a controlled substance (citing U.S.S.G. § 2D1.1(b)(12)), (2) being an organizer, leader, manager, or supervisor of criminal activity (citing § 3B1.1(c)), and (3) obstructing justice by committing perjury at trial (citing § 3C1.1). [Doc. 146 at 7]. Because Mr. Abuzuhrieh has no prior

convictions and is in criminal history category I, the PSR calculates the advisory Guidelines range to be 292 to 365 months.

However, the parties later agreed that the weight of spice attributed to Mr. Abuzuhrieh for sentencing purposes wrongfully included the weight of packaging materials and the weight of potpourri estimated not to contain synthetic cannabinoids, reducing the weight from 62 kg to 34.5 kg. [Doc. 154 at 16–17]. Accordingly, notwithstanding Mr. Abuzuhrieh's Objections, the agreed-upon quantity attributable to Mr. Abuzuhrieh for sentencing purposes is 5,761.5 kg of marijuana, changing the base offense level to 32. If each of the above enhancements applies, the total offense level would be 38, resulting in a revised advisory Guidelines range of 235 to 293 months.

Mr. Abuzuhrieh submitted six objections to the PSR, disputing all of the above steps in the PSR's calculation of a total offense level. First, Mr. Abuzuhrieh objects to equating the substances at issue to THC, arguing that the 34.5 kg of spice at issue should instead be equated to marijuana using a 1:1 ratio. [Doc. 154 at 2]. Second, Mr. Abuzuhrieh objects that he should not be held responsible for the substances seized in Suite H, which he argues belonged to his supplier. *Id*. at 17–19. Third, Mr. Abuzuhrieh objects that the enhancement for maintaining premises for the purpose of distributing controlled substances should not apply because his smoke shop made substantial legitimate sales. *Id*. at 19–21. Fourth, Mr. Abuzuhrieh objects that the enhancement for being a leader or supervisor of criminal activity should not apply because Mr. Abuzuhrieh was merely an "end-distributor," arguing instead that he qualifies for a safety-valve downward departure under U.S.S.G. § 5C1.2(a). *Id*. at 21–24. Fifth, Mr. Abuzuhrieh objects that the enhancement for obstruction of justice should not apply because he did not commit perjury by testifying that he did not know spice was illegal. *Id*. at 24–28.

Finally, Mr. Abuzuhrieh objects to the assertion in the PSR that a downward departure is not warranted on account of his family ties and responsibilities under U.S.S.G. § 5H1.6, arguing that he has special family circumstances warranting a downward departure, particularly as the sole breadwinner for his wife and six young children, one of whom has developmental disabilities, and as a non-citizen who faces possible deportation to the occupied West Bank.  *Id*. at 28–30.

This Court held an evidentiary hearing on January 18, 2017, at which Mr. Abuzuhrieh and the United States presented competing expert testimony regarding Mr. Abuzuhrieh's first objection: whether the substances at issue are properly equated to THC and whether the 1:167 marijuana equivalency ratio would be appropriately applied in this case.  [Doc. 182].  Dr. Jordan Trecki, a DEA-employed pharmacologist, testified for the United States in favor of equating the entire weight of spice at issue to THC, and in favor of applying the 1:167 marijuana equivalency ratio for THC.  Dr. Nicholas Cozzi, a professor and researcher at the University of Wisconsin Madison School of Medicine and Public Health, testified against equating the substances seized to THC and against application of the 1:167 ratio to the entire weight of potpourri at issue.  Mr. Abuzuhrieh's wife, Hala Zahrieh, also testified briefly in support of Mr. Abuzuhrieh's arguments for a downward departure or variance.

## LAW REGARDING THE SENTENCING GUIDELINES

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court eliminated the mandatory provisions from the Sentencing Reform Act, rendering the U.S. Sentencing Guidelines advisory.  Under 18 U.S.C. § 3553(a), which remains intact, Congress directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four sentencing purposes:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)–(D).    To achieve these purposes, § 3553(a) asks sentencing courts to consider (i) the Guidelines, (ii) the nature of the offense and the defendant's character, (iii) the available sentences, (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes, and (v) the need to provide restitution to victims.    *See* 18 U.S.C. § 3553(a)(1), (3)–(7).

In the Tenth Circuit, although the sentencing court must balance the § 3553(a) factors without presuming in favor of the Guidelines range, a sentence within the Guidelines range is presumptively reasonable at the appellate level.    *United States v. Terrell*, 445 F.3d 1261, 1264 (10th Cir. 2006).    *See also Rita v. United States*, 551 U.S. 338, 351 (2007); *Gall v. United States*, 552 U.S. 38, 46–47 (2007).    This does not mean, however, that sentencing courts do not have discretion to issue a sentence below the Guidelines range based on policy concerns as applied towards a particular defendant.    Importantly, sentencing courts may disagree with disparities in how certain drugs are treated under the Guidelines.    In *Kimbrough v. U.S.*, 552 U.S. 85, 91 (2007), the Supreme Court considered whether "a sentence . . . outside the guidelines range is per se unreasonable when it is based on a disagreement with the sentencing disparity for crack and powder cocaine offenses."    The Court held that a sentencing judge "may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses" as part of the Court's analysis of the § 3553(a) factors, in order to render a sentence that is no "greater than

necessary" in meeting sentencing objectives.    *Id.*

Before considering the § 3553(a) factors, a sentencing court must determine the imprisonment range under the Guidelines by finding the base offense level and then adding any applicable enhancements to arrive at a total offense level.    District courts must start by calculating the proper Guidelines range before considering whether to vary a sentence outside of the advisory Guidelines range.    *See, e.g., U.S. v. Pacheco-Soto*, 386 F.Supp.2d 1198, 1204 (D.N.M. 2005) (Vázquez, J.) ("Although the Guidelines are no longer mandatory, courts must continue to consult them when making sentencing decisions.    Thus, the Court will . . . determine a Guidelines range by ruling on objections to the PSR and resolving factual disputes to the extent they exist.").    Under U.S.S.G. § 1B1.3(a), the base offense level is determined based on the following:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)–(4).    In assessing relevant conduct for sentencing purposes, evidence

need not be admissible and may be considered if it has sufficient indicia of reliability. § 6A1.3. Furthermore, "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." *United States v. Washington*, 11 F.3d 1510, 1516 (10th Cir. 1993) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 84 (1986)).

When applying enhancements under the Guidelines, the Sixth Amendment requires that any facts increasing the penalty for a crime "beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 460, 490 (2000). However, a defendant may only assert an error under this rule if the facts at issue increased the sentence beyond the statutory maximum. *United States v. O'Flanagan*, 339 F.3d 1229, 1232 (10th Cir. 2003). Otherwise, again, "sentencing facts in the ordinary case need only be proven by a preponderance." *United States v. Olsen*, 519 F.3d 1096, 1105 (10th Cir. 2008) (quoted authority omitted).[1]

## DISCUSSION

As to Mr. Abuzuhrieh's first objection, the Court finds that although it shares many of Mr. Abuzuhrieh's concerns about the appropriateness of applying the 1:167 ratio in this case, having found that the substances at issue are most closely similar to THC, the Court must overrule the objection and apply this ratio for purposes of calculating the advisory Guidelines range.

---

[1] The PSR correctly notes that the statutory maximum under 21 U.S.C. § 841(b)(1)(C) is 240 months. However, the advisory Guidelines range in the PSR exceeds the statutory maximum. Pursuant to U.S.S.G. § 5G1.2(d) and Tenth Circuit caselaw, sentencing courts may stack sentences for each count such that a defendant like Mr. Abuzuhrieh, who has been convicted on more than one count of violating 21 U.S.C. § 841(a), may be sentenced to more than 240 months by assigning the months in excess of 240 to another count and ordering that the sentences run consecutively. *See, e.g.*, *United States v. Anderson*, 41 Fed. Appx. 257 (10th Cir. 2002); *United States v. Lott*, 310 F.3d 1231 (10th Cir. 2002); *United States v. Jackson*, 60 Fed. Appx. 726 (10th Cir. 2003). Notwithstanding the option to stack sentences, the United States in its response to Mr. Abuzuhrieh's objections states that "given the statutory maximum, his guideline range is 235 to 240 months imprisonment." [Doc. 169 at 21]. The Court will not stack sentences and considers 240 months to be the maximum possible sentence in this case.

As to Mr. Abuzuhrieh's second objection that he not be held responsible for the potpourri seized in Suite H, the Court overrules the objection because Mr. Abuzuhrieh had total control over Suite H. As to the third objection that Mr. Abuzuhrieh did not maintain premises for the purposes of selling controlled substances, the Court overrules the objection in light of Mr. Abuzuhrieh's use of Suite H to store spice and the indication that spice was Mr. Abuzuhrieh's most lucrative product for sale at the smoke shop. As to the fourth objection that Mr. Abuzuhrieh was not a leader or supervisor of criminal activity, the Court sustains the objection because the facts indicate that Mr. Abuzuhrieh was an end-distributor of spice. As to the fifth objection that Mr. Abuzuhrieh did not commit perjury by testifying that he did not know the spice he was selling was illegal under federal law, the Court sustains the objection because the jury's guilty finding at trial does not establish by a preponderance that Mr. Abuzuhrieh willfully submitted false testimony. Finally, as to the sixth and final objection that Mr. Abuzuhrieh is entitled to a downward departure due to his family ties and responsibilities, the Court overrules the objection because Mr. Abuzuhrieh's circumstances, although compelling, are not sufficiently extraordinary.

However, the Court grants a downward variance because the factors listed under § 3553(a) strongly suggest that a sentence within the advisory Guidelines range of 235 to 240 months would be greater than necessary to achieve the goals of sentencing in this case.

I.      **The Court Overrules Mr. Abuzuhrieh's Objection to the PSR's Use of the 1:167 Ratio in Equating the Weight of Spice Seized to THC.**

In short, the Court finds that the controlled substances at issue are most closely similar to THC and that, accordingly, the Court must apply the 1:167 ratio in its calculation of the base offense level under the Sentencing Guidelines. Although the Court has substantial concerns

about the appropriateness of multiplying the entire weight of potpourri by 167, the Court does not have authority to amend the Guidelines and instead discusses these concerns in support of granting a downward variance under § 3553(a). Accordingly, although ultimately the Court shares many of the concerns raised by Mr. Abuzuhrieh, the objection must be overruled.

As discussed above, the PSR equates the quantity of spice seized to THC because the controlled substances at issue are listed neither in the Drug Quantity Table, U.S.S.G. § 2D1.1(c), nor in the Marijuana Equivalency Table, U.S.S.G. § 2D1.1 cmt. n.8(D). § 2D1.1 Comment 6 provides a test for determining the most closely related substance listed on the table. The three factors courts should consider are:

> A. "Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

> B. Whether the controlled substance . . . has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.

> C. Whether a lesser or greater quantity of the controlled substance . . . is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline."

As for Factor A, the United States acknowledges that the chemical structures of all three substances are distinctly different from *any* of the substances referenced in the guidelines. [Doc. 169 at 4]. This difference in chemical structure, and the fact that such differences allow users of synthetic cannabinoids to avoid testing positive for marijuana use, is partly why there are markets for spice in the first place. Accordingly, this factor will not inform the Court's analysis.

As for Factor B, at the evidentiary hearing, Dr. Trecki testified that the controlled substances at issue, XLR-11, UR-144, and 5F-PB-22, have all been found to have substantially

similar pharmacological effects on the central nervous system as THC. Dr. Trecki presented four categories of data in support of his position: (1) binding studies, which are *in vitro* experiments demonstrating that all three substances and THC bind to the cannabinoid receptor ($CB_1$); (2) functional assays, which are *in vitro* experiments demonstrating that all three substances and THC act as agonists (creating pharmacological effects, as opposed to antagonists, which block effects) at the cannabinoid receptor; (3) THC drug discrimination studies, which demonstrate that small rodents experience effects from these substances similar to the effects they experience from THC; and (4) case studies of human beings based on hospital or other emergency reports, in which individuals overdosed or died after consuming one of the substances at issue. [Docs. 169-1; 169-2; 169-3; 182 at 30–46]. In response, Mr. Abuzuhrieh's expert, Dr. Nicholas Cozzi, argues that *in vitro* experiments and *in vivo* studies on animals are not necessarily indicative of a chemical's effect on humans. [Docs. 177-1 at 5; 182 at 148–49]. Dr. Trecki takes the position that testing synthetic cannabinoids on humans would be unethical because these drugs are only known to cause harmful effects, and he argues that although case studies are few and lack the usual controls of a scientific experiment, they nevertheless demonstrate that use of spice is more dangerous than use of marijuana. *Id*. at 126.

As for Factor C, whether a greater or lesser quantity of the substance is necessary to mimic THC, Dr. Trecki testified that all three substances are at least as potent as THC. Specifically, Dr. Trecki presented drug discrimination results showing that UR-144 is approximately twice as potent as THC, XLR-11 is approximately four times as potent as THC, and 5F-PB-22 is approximately 21 times more potent than THC. [Doc. 182 at 45–46]. Dr. Cozzi testified in response that these effects cannot be extrapolated to humans because (1) the route of administration of the drug is different because the rodent subjects have the drug injected

and human consumers smoke it, and (2) the effects of the drugs vary depending on the dose.    *Id*.

at 149–152.    *See also* Doc. 177-1 at 6.

The Court is persuaded by Dr. Trecki's testimony that the synthetic cannabinoids at issue have similar effects on the central nervous system as THC, and are at least as potent as THC. Although clinical trial results involving human subjects are unavailable, the case studies presented, in which individuals overdosed or died after using XLR-11, UR-144, or 5F-PB-22, are extremely troubling.    In sum, Dr. Trecki's testimony indicated that smoking spice is more dangerous than smoking marijuana, for two overarching reasons.    First, spice has a more dangerous chemical makeup than marijuana.    Dr. Trecki testified that, whereas marijuana contains numerous naturally occurring chemicals aside from THC, at least one of which seems to mitigate the effects of THC, spice is manufactured by applying the single synthetic chemical to inert plant material that does not appear to mitigate the effects of the active ingredient being applied.    [Doc. 182 at 11, 47].    Therefore, although spice and marijuana may look like similar smokeable products, spice lacks the mitigating chemicals that naturally occur in marijuana. Second, because spice is manufactured haphazardly, with the synthetic cannabinoid applied very inconsistently and unevenly, there is no quality control during the manufacturing process to ensure that a user would be safe from ingesting a higher amount of the drug.    [Doc. 182 at 78]. In light of these distinctions, the Court is reluctant to find that spice and marijuana are similar in their effects on humans and their potency such that spice should be equated to marijuana using a 1:1 ratio.

Accordingly, because the United States demonstrated that experimental results and case studies show the substances at issue have similar effects and potency as THC, the Court finds that the substances at issue are most similar to THC.    According to the Marijuana Equivalency

Table in the Guidelines, the 1:167 ratio must be applied.

Mr. Abuzuhrieh argues that if the Court does not apply a 1:1 ratio, the Court should depart from the Guidelines and apply a 1:7 ratio based on data showing the current THC content of marijuana. Dr. Cozzi testified that because the THC content of marijuana has increased over the last several years, the 1:167 ratio is outdated at best. He argues that, based on current data from the National Institute on Drug Abuse (NIDA), the current THC content of marijuana today is around 14.3%, which would make the marijuana equivalency ratio closer to 1:7. [Docs. 177-1 at 3; 182 at 144]. Although the Court notes that the 1:7 ratio argued by Dr. Cozzi appears to have more scientific basis than the 1:167 ratio in the Guidelines, the Court does not have authority to apply a 1:7 ratio, in lieu of the 1:167 ratio, to determine the advisory Guidelines range in this case. The Court does not have authority to amend the Guidelines, only to consider them advisory. *See Kimbrough v. U.S.*, 552 U.S. at 91 ("A district judge must include the Guidelines range in the array of factors warranting consideration. The Judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing. 18 U.S.C. § 3553(a) (2000 ed. and Supp. V)."). Because calculation of the imprisonment range under the Guidelines must faithfully follow the terms of the Guidelines, the Court will apply the 1:167 multiplier in determining the advisory Guidelines range, but looks to the 1:7 ratio, which appears to be based on credible data concerning the THC content of marijuana, as potentially persuasive for variance purposes.

Mr. Abuzuhrieh further argues that the 1:167 ratio should not apply to the entire weight of spice but rather to the weight of controlled substances in this case, which is unknown. While the Court is able to consider this issue in its variance analysis, the United States rightfully argues that the carrier weight must be counted because the Guidelines clearly and unambiguously

require it. [Docs. 169 at 8; 184 at 3–4]. Note 1 to U.S.S.G. § 2D1.1(c) states that in calculating the base offense level through the Drug Quantity Table, "the entire weight of any mixture or substance containing a detectable amount of the controlled substance" is used. Mr. Abuzuhrieh asks the Court to consider extending the exception the Commission carved out for LSD under U.S.S.G. § 2D1.1, cmt. n. 26. [Doc. 177 at 3–4]. However, Mr. Abuzuhrieh has not cited, and the Court has been unable to identify, any precedent for extending this exception. Furthermore, after contacting the Sentencing Commission directly, this Court was advised that sentencing courts look to the § 3553(a) analysis when there is a concern about including the carrier medium in setting the base offense level, rather than interpreting the exception for LSD to include other controlled substances. Indeed, under *Kimbrough*, sentencing courts are obligated to consider the advisory range under the Guidelines, and may only move on to consider the § 3553(a) factors after having determined and considered this range. *See Kimbrough v. U.S.*, 552 U.S. 85, 91 (2007). Accordingly, the Court acknowledges that the proper analysis under § 2D1.1 of the Guidelines includes the carrier medium or the entire potpourri mixture. However, in granting a downward variance in this case, the Court registers its concerns that including the weight of the entire potpourri mixture sets the base offense level artificially high relative to the much lower weight of controlled substances contained therein, resulting in inconsistent sentences between defendants found with pure chemicals and defendants found only with potpourri.

In sum, because the Court finds that the synthetic cannabinoids at issue are most closely similar to THC, the Court does not find that a 1:1 marijuana equivalency ratio is appropriate and does not have authority to apply another ratio not provided in the Guidelines. Accordingly, the Court adopts the recommendation of the PSR for purposes of determining the base offense level under the Guidelines. Under the Sentencing Guidelines, the quantity of controlled substances

attributable to Mr. Abuzuhrieh for sentencing purposes is 5,761.5 kg of marijuana, resulting in a base offense level of 32. The Court reserves its substantial concerns about the appropriateness of imposing a sentence within the Guidelines range for its analysis under § 3553(a).

## II.    The Court Overrules Mr. Abuzuhrieh's Objection to Including the Spice Seized in Suite H.

Mr. Abuzuhrieh objects that the spice seized from Suite H should not count towards his base offense level because that spice belonged to his supplier, Hossam. [Doc. 154 at 17]. Accordingly, the issue before the Court is whether, under U.S.S.G. § 1B1.3(a), Mr. Abuzuhrieh jointly undertook criminal activity with respect to the spice in Suite H, such that he should be held accountable for this quantity in addition to the spice seized from his shop. Because the record at trial sufficiently shows that Mr. Abuzuhrieh had control over the spice in Suite H, the Court overrules the objection and includes the spice in Suite H towards Mr. Abuzuhrieh's base offense level.

At sentencing, the United States bears the burden of proving by a preponderance of the evidence that conduct of coconspirators is to be attributed to the defendant for sentencing purposes. *United States v. Melton*, 131 F.3d 1400, 1403 (10th Cir. 1997). In *U.S. v. Figueroa-Labrada*, the Tenth Circuit explained that the amount of drugs attributable to a defendant convicted of conspiracy under 21 U.S.C. § 846 "is not necessarily based on the overall amount involved in the conspiracy for which he was convicted or on the transactions in which he personally participated. Instead, the sentencing court considers a set of factors known as 'relevant conduct.'" 720 F.3d 1258, 1265 (10th Cir. 2013) (citing U.S.S.G. § 1B1.3). Under § 1B1.3(a)(1)(A), (B), "relevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all

acts and omissions of others that were . . . reasonably foreseeable in connection with that criminal activity." Therefore, a defendant is "accountable for all quantities of contraband that were within the scope of the criminal activity that he jointly undertook." *Figueroa-Labrada*, 720 F.3d at 1265 (citing U.S.S.G. § 1B1.3 cmt. n.2 (stating also, however, that "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy")). Importantly, the district court is required at sentencing to "analyze, and make particularized findings about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole." *Id.* (citing *U.S. v. Melton*, 131 F.3d 1400, 1404 (10th Cir. 1997)).

Mr. Abuzuhrieh argues that he should not be held responsible for the spice seized in Suite H because Hossam was engaged in larger scale criminal activity, distributing spice to other smokeshops throughout Albuquerque, in which Mr. Abuzuhrieh did not participate. [Doc. 154 at 18]. Mr. Abuzuhrieh testified at trial that although he had access to Suite H, those supplies were mainly picked up by Hossam once a month and delivered to other shops by Hossam, not Mr. Abuzuhrieh, and that although he would sometimes take from these supplies to sell at his store, Mr. Abuzuhrieh would record the amount and pay Hossam for the potpourri he took. [Docs. 133 at 183–86; 154 at 18]. In sum, Mr. Abuzuhrieh argues that because the spice in Suite H did not "belong" to him, his base offense level should not include it, reducing the weight of spice at issue to 1.046 kg.

However, the United States argues that even if Mr. Abuzuhrieh paid Hossam for the potpourri he took from Suite H, Mr. Abuzuhrieh nevertheless engaged in enough "relevant conduct" to be held accountable for the spice seized from Suite H. [Doc. 169 at 12]. The record shows that Mr. Abuzuhrieh paid rent for Suite H and had the only key to the space. [Doc. 133 at

184, 202–03].   The United States argues that it is irrelevant whether Mr. Abuzuhrieh was helping

Hossam supply these drugs to the greater Albuquerque market because he had physical control

over this supply.   [Doc. 169 at 13].

The Court is inclined to agree that because Mr. Abuzuhrieh paid the rent for Suite H,

possessed the only key to Suite H, and took from the supply in Suite H as he needed, he engaged in

enough relevant conduct to be held responsible for the entire supply of spice seized from Suite H.

Mr. Abuzuhrieh clearly had physical control over the spice in Suite H.   Had he sought to sell the

entire stockpile, presumably he would have been able to do so.   Because Mr. Abuzuhrieh paid

rent for Suite H on behalf of his supplier and, as the only person with a key, had special access to

this supply, he engaged in conduct amounting to possession of the supply in Suite H, in conspiracy

with Hossam, to sell at least what he needed through his own store, and that he intended to and did

sell what he needed from this supply in his own store.   Accordingly, the objection is overruled and

the spice seized from Suite H will be included towards the base offense level.

### III.    The Court Applies a Two-Level Enhancement for Maintaining Premises for the Purpose of Distributing a Controlled Substance.

The PSR calls for a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) because

"defendant maintained a premises for the purpose of distributing a controlled substance."   [Doc.

146 ¶ 18].   Mr. Abuzuhrieh objects that selling illegal substances was not the purpose of his

smoke shop, which sold many other legal products and which started selling the spice at issue at a

time when those substances were not illegal.

In order for this enhancement to apply, courts should consider "(A) whether the defendant

held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the

defendant controlled access to, or activities at, the premises."   U.S.S.G. § 2D1.1 cmt. n. 17.

However, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises were maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. . . . the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.*

Mr. Abuzuhrieh cites caselaw suggesting that this enhancement should only apply when the purported legitimate purpose of the premises is so absent that the purpose of maintaining the premises to conduct illicit drug transactions is readily apparent. *See, e.g.*, *United States v. Mays*, 606 Fed.Appx. 911, 916 (10th Cir. 2015) (applying this enhancement where the residential house at issue contained no practical living furniture but did contain "tools of the [drug-trafficking] trade"). Many cases involving residential houses find that this enhancement is appropriate where there is substantial evidence of numerous drug transactions occurring at the house and where tools of the drug trade are found in the house. *See, e.g.*, *United States v. Roybal*, 2016 WL 3129624 (D.N.M. May 24, 2016) (Browning, J.); *United States v. Fuentes-Ontiveros*, 920 F.Supp.2d 1198 (D.N.M. 2012) (Johnson, J.). *See also United States v. Cortez-Diaz*, 565 Fed.Appx. 741 (10th Cir. 2014) (noting in addition that the house had no furniture). However, where the space is a legitimate business that the government argues is a front for illicit drug business, courts consider whether the drug business is incidental to the lawful business or whether the lawful business is being utilized to conceal substantial illegitimate business. For example, in *United States v. Madrigal*, 2014 WL 1414812, at *4 (N.D. Ind. Apr. 14, 2014), the court found that the defendant's drug business was not merely incidental to the lawful purpose of defendant's restaurant. The court considered the magnitude of drug business done at the restaurant, the quantity of drugs stored

there, the discussions that took place there regarding drug business, and the ways in which the defendant used the legitimacy of the restaurant business to conceal his activities, such as, for example, hiding methamphetamine in a cake. *Id.*

The present case involves two premises: Mr. Abuzuhrieh's shop (Suite E), which did significant business selling items that were not illegal, and Suite H where Mr. Abuzuhrieh stored spice for his supplier. Although Mr. Abuzuhrieh testified that he rented Suite H in order to store chairs and move his shop to that space at a later date, Mr. Abuzuhrieh was using Suite H at the time of his arrest for the sole purpose of storing spice. [Doc. 133 at 203–04]. Therefore, Mr. Abuzuhrieh paid rent on Suite H for the sole purpose of storing a controlled substance, for purpose of distribution, and he had total control over Suite H because he possessed the only key. These facts address factors (A) and (B) under the Guidelines. U.S.S.G. § 2D1.1 cmt. n. 17. Furthermore, renting a storage space solely to stash illegal drugs is readily analogous to cases applying this enhancement to stash houses, as in *Mays*.

With respect to his smoke shop, Mr. Abuzuhrieh testified that spice was the most lucrative product he sold there. [Doc. 133 at 167].[2] However, the record does not convey that the legal products for sale at the shop were a front to enable the sale of spice, as in *Madrigal*. Unlike *Madrigal*, the record in this case does not necessarily suggest that discussions about the distribution of spice took place at the shop or that Mr. Abuzhrieh used the legitimacy of the shop to disguise sales or transfers of spice. Indeed, although the potpourri packets were not on display in his shop, Mr. Abuzhrieh sold potpourri packets openly at the cash register. [Doc. 132 at 31–38;

2  Mr. Abuzuhrieh points out in his objection that although Islam Kandil, the co-Defendant in this case, asserted in an interview that the store sold 40-50 packs of spice per day, Special Agent Jeffrey McKinley testified at trial that this estimate was more than double the amount actually sold at the store each day. [Doc. 154 at 21, n.12 (citing Doc. 133 at 37)]. In other words, although spice was a lucrative item for the store, it was not as profitable as the PSR suggests. *See* Doc. 146 at ¶ 12 (stating that Mr. Kandil "admitted to selling 40 to 50 packs of synthetic marijuana each day for two or three months" without also mentioning S.A. McKinley's testimony).

45–54]. However, the Court considers the big picture that Mr. Abuzuhrieh's most profitable products were the spice products, and that Mr. Abuzuhrieh had total control over a sizeable supply of spice in Suite H. Therefore, although Mr. Abuzuhrieh also conducted legitimate business from his smoke shop, in light of his use and control of Suite H for the sole purpose of selling spice, the Court finds that a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) is appropriate and Mr. Abuzuhrieh's objection is overruled.

## IV. The Court Does Not Apply an Enhancement for Being a Leader in Criminal Activity, But Declines to Apply a Safety-Valve Reduction.

The PSR calls for a two-level enhancement because "the defendant was an organizer, leader, manager, or supervisor" under U.S.S.G. § 3B1.1(c). [Doc. 146 ¶ 20]. The United States argues that because Mr. Abuzuhrieh gave direction to his employee, Islam Kandil, including directing Kandil to sell spice at the shop, this enhancement should apply. [Doc. 169 at 14–15]. The United States cites *United States v. Backas*, 901 F.2d 1528, 1529–30 (10th Cir. 1990), in which the defendant sold illegal drugs from a house and employed a "doorman" who let customers in and screened them. The Tenth Circuit held that "[i]n order to be a supervisor, one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity for which the sentence is given." *Id.* at 1530. Mr. Abuzuhrieh objects and argues, first, that he is not a supervisor under the Guidelines because he had an ordinary employer-employee relationship with Kandil in the operation of a legitimate smoke shop business. [Doc. 154 at 23].

Application Note 4 to § 3B1.1 directs courts to consider "the exercise of decision making authority, the nature of participation in commission of the offense, the recruitment of accomplices, the claimed right to a larger share of profits, the degree of participation in planning or organizing, the nature and scope of illegal activity, and the degree of control and authority exercised over

others."   Mr. Abuzuhrieh argues that he "was not engaged in a hierarchical criminal activity" and was merely an "end-distributor."   [Doc. 154 at 23].   Indeed, the record indicates that Mr. Abuzuhrieh was not involved in a wider distribution scheme and merely sold potpourri to customers at his store.   With respect to storing spice in Suite H, the record indicates that although Mr. Abuzuhrieh had control over this supply, there is no evidence that he was involved in or benefited from sales to other smoke shops.   Furthermore, Mr. Abuzuhrieh's supervision of Kandil is distinguishable from the doorman in *Backas*, where the sole purpose of the doorman's employment was to facilitate illegal drug sales.   Mr. Kandil was an employee of an otherwise legitimate smoke shop business, and Mr. Abuzuhrieh's supervision of Mr. Kandil only partially pertained to selling spice.   The record does not indicate any extra or unusual instruction or supervision over Mr. Kandil's handling of the spice products for sale at the shop.   Because the record best characterizes Mr. Abuzuhrieh as an "end-distributor" of spice, the enhancement under § 3B1.1(c) should not apply and Mr. Abuzuhrieh's objection is sustained.

However, Mr. Abuzuhrieh further argues that he is entitled to a safety-valve reduction under U.S.S.G. §§ 2D1.1(b)(17), 5C1.2(a), which provides a two-level downward departure if a defendant meets the following five criteria:

1.  the defendant has no more than 1 criminal history point;

2.  the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense;

3.  the offense did not result in death or serious bodily injury to any person;

4.  the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

5.  not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has

22

concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

§ 5C1.2(a). Mr. Abuzuhrieh clearly satisfies criteria 1, 2, and 3. Criterion 4, discussed above, is disputed but the Court finds that Mr. Abuzuhrieh was not a leader or supervisor. Critically, the United States argues that Mr. Abuzuhrieh cannot satisfy the fifth criterion because he only testified at trial and did not debrief or otherwise cooperate with the government in any other way. [Doc. 169 at 15]. In his reply brief, Mr. Abuzuhrieh did not address whether through his testimony he provided all information and evidence that he has concerning his sale of spice. [Doc. 177 at 10–11]. In his opening brief stating his eligibility for this safety-valve, Mr. Abuzuhrieh only states that "the Government cannot dispute that Mr. Abuzuhrieh . . . provided all information and evidence related to the distribution of synthetic cannabinoids to the Government, when he testified truthfully at trial, and subjected himself to cross-examination." [Doc. 154 at 22].

The Court is not inclined to grant a two-level downward departure under §§ 2D1.1(b)(17), 5C1.2(a) because Mr. Abuzuhrieh has not established by a preponderance that he meets the fifth criterion. Testifying truthfully and subjecting himself to cross examination does not necessarily show that Mr. Abuzuhrieh has divulged all information and evidence he has concerning his sale of spice. For one thing, the United States' cross examination of Mr. Abuzuhrieh at trial was limited to his credibility and topics examined on direct examination. Because Mr. Abuzuhrieh has not established that he "has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan," the Court denies Mr. Abuzuhrieh's request for a safety-valve departure.

## V. The Court Sustains Mr. Abuzuhrieh's Objection and Does Not Apply the Enhancement for Obstruction of Justice.

The PSR calls for a two-level enhancement because "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice . . . and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct" under U.S.S.G. § 3C1.1. [Doc. 146 ¶ 21]. This enhancement applies if a defendant commits perjury at trial. 3C1.1 cmt. n.4(b); *United States v. Dunnigan*, 507 U.S. 87, 96 (1993) (noting that "a defendant's right to testify does not include a right to commit perjury," and finding that the enhancement applies to perjured trial testimony). Perjury occurs when "[a] witness testifying under oath or affirmation . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. "[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under [that] perjury definition . . . ." *Id*. at 95; *see also U.S. v. Flonnory*, 630 F.3d 1280, 1287–88 (10th Cir. 2011) (finding no error in the district court's application of this enhancement, where the defendant gave testimony concerning statements he made to potential investors that conflicted with testimony from the defendant's victims).

On direct examination, Mr. Abuzuhrieh testified as follows:

Defense Counsel: Did anybody ever tell you—did you ever find out in any way, shape, or form, that the spice that you were selling, the Bizarro, the Scooby Snax, or any of it, was a federally controlled substance?

Mr. Abuzuhrieh: No.

[Doc. 134 at 188]. The PSR states that by testifying that he did not know that spice was illegal,

Mr. Abuzuhrieh committed perjury, because he "knew his cousin's shop was raided in 2013 and his brother Aiman was sentenced to probation for selling spice." [Doc. 146 ¶ 12]. The Court agrees with Mr. Abuzuhrieh that these facts do not indicate that the above testimony was willfully false. Indeed, Mr. Abuzuhrieh did not testify that he did not know spice was generally illegal—he only testified that he did not know the spice he sold was illegal under federal law. The PSR therefore overstates Mr. Abuzuhrieh's testimony and ignores the fact that synthetic cannabinoids become federally controlled on an individual basis, not as a group. Mr. Abuzuhrieh's statement that he was not aware that the spice products he was selling were illegal under federal law is not in conflict with other evidence at trial that Mr. Abuzuhrieh's brother was sentenced for selling spice products, containing unspecified synthetic cannabinoids, in violation of *state* law, [Doc. 133 at 162], nor with the fact that his relative, Mr. Barash, was arrested by the DEA for selling spice containing unspecified synthetic cannabinoids, but never charged, [Doc. 132 at 16].

In *Flonnory*, the defendant testified about statements he made to potential investors, but other witnesses gave directly conflicting testimony about these same statements. *Flonnory*, 630 F.3d at 1287–88. Under these circumstances, the district court found that the defendant likely committed perjury. *Id*. The present case is entirely distinguishable because the evidence at issue does not directly conflict. Even assuming that Mr. Abuzuhrieh was fully aware of both incidents between his relatives and law enforcement, such knowledge nevertheless fails to suggest, let alone establish by a preponderance, that Mr. Abuzuhrieh knew the specific spice products he was selling were illegal under federal law and therefore willfully lied in answering his attorney's question. Mr. Barash was not charged with federal crimes, so at best, knowledge of the two incidents suggests knowledge of illegality under state law only. Because knowledge of encounters that his family members had with law enforcement does not squarely negate Mr. Abuzuhrieh's testimony

that he did not know the spice products he sold were illegal under federal law, the Court does not find that Mr. Abuzuhrieh committed perjury and sustains the objection.

The United States argues that because "[t]he jury found his testimony to be incredible and found him guilty of all counts," the Court should find by a preponderance that Mr. Abuzuhrieh willfully submitted false testimony. [Doc. 169 at 17]. However, the Court must make its own independent finding of perjury, incorporating its own impressions of the testimony at trial. *Dunnigan*, 507 U.S. at 95. The Court's interpretation of Mr. Abuzuhrieh's testimony is that although he seemed to be aware of the two incidents, Mr. Abuzuhrieh did not willfully testify falsely when stating that he did not know the substances he sold were illegal under federal law. Mr. Abuzuhrieh clearly did not possess much familiarity with specific synthetic cannabinoid chemicals or with federal laws, and the Court finds that under these circumstances, Mr. Abuzuhrieh's testimony regarding his knowledge was at most confused, but not willfully false. Accordingly, the Court sustains Mr. Abuzuhrieh's objection and does not apply a two-level enhancement for obstruction of justice under § 3C1.1.

## VI. The Court Declines to Grant a Downward Departure Under U.S.S.G. § 5H1.6.

Mr. Abuzuhrieh's sixth and final objection to the PSR is that he is entitled to a downward departure under U.S.S.G. § 5H1.6 due to his family ties and responsibilities. As a result of Mr. Abuzuhrieh's incarceration, his wife and six young children have had to move into the basement studio of his wife's elderly parents' home in Brooklyn, New York, where all seven of them share a single room and Mrs. Zarieh struggles to support the family as a cashier. [Doc. 182 at 192–94]. Furthermore, Mr. Abuzuhrieh's eight-year-old son has developmental disabilities and has regressed since his father's incarceration. *Id*. at 196–97.

Although Mr. Abuzuhrieh has substantial personal circumstances that will be considered

in the Court's analysis of the § 3553(a) factors, family ties and responsibilities "are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. The Application Note to § 5H1.6 lays out the unusual circumstances in which a departure would be warranted based on a family's loss of caretaking and financial support, emphasizing that the family's suffering must go beyond the "sort ordinarily incident to incarceration" and that defendant's caretaking and financial support must be irreplaceable. § 5H1.6 cmt. n.1(b)(ii)–(iii). Although Mr. Abuzuhrieh was the sole breadwinner for his family and although his family currently struggles to support itself and care for a disabled child, the Court is not convinced that these circumstances are so highly unique as to justify a departure. Therefore the Court overrules the objection but considers these factors under § 3553(a).

## VII. Variance Under § 3553(a)

Having ruled on all of Mr. Abuzuhrieh's objections to the PSR, the advisory calculation of Mr. Abuzuhrieh's sentence under the Guidelines is as follows. Starting from a base offense level of 32, the Court applies a two-level enhancement for maintaining premises for the purpose of distributing a controlled substance, rejecting all of the parties' other arguments for applying other enhancements or departures, bringing Mr. Abuzuhrieh's total offense level to 34. Because Mr. Abuzuhrieh has no prior convictions and is in criminal history category I, the advisory imprisonment range under the Guidelines is 151 to 188 months.

In varying from a properly calculated Guideline sentence, this Court must determine whether "the § 3553(a) factors, on a whole, justify the extent of the variance." *United States v. Huckins*, 529 F.3d 1312, 1316 (10th Cir. 2008). The Court may consider any factor listed under § 3553(a), including factors that would otherwise not be available for consideration under the Guidelines. *Id*. at 1319–20. Here, the Court has serious concerns with the artificially high

base offense level under the Guidelines. It is in precisely such unreliable situations that courts have authority to vary from the Guidelines based on a policy disagreement, to ensure that sentences are no "greater than necessary" in meeting sentencing objectives. *Kimbrough v. U.S.*, 552 U.S. 85, 91 (2007); *Spears v. United States*, 555 U.S. 261, 265–66 (2009) (clarifying that "district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement with those Guidelines").

The Court finds that under § 3553(a), applying the 1:167 marijuana equivalency ratio would be inappropriate in this case and impose a punishment greater than necessary because (1) there are numerous barriers to ascertaining the quantity of controlled substances seized relative to the weight of inert plant material, resulting in inconsistent sentences between defendants being held responsible for pure synthetic cannabinoids and defendants found only with ready-to-use potpourri; and (2) the Court is unable to identify any scientific basis for applying the 1:167 ratio.

Although the Guidelines call for equating the weight of potpourri to the same weight of pure THC, there are gaps in the Court's knowledge of the facts in this case that make application of the 1:167 equivalency ratio imprecise and unjust. First, the United States cannot determine what proportion of the spice seized in this case is the actual controlled substances. Dr. Trecki and the DEA witnesses at trial testified that current DEA resources have no method available for determining the quantity of controlled substances within spice material. [Docs. 182 at 77; 132 at 203–06, 232–33]. Without knowing the quantity of the controlled substances seized, the Court is reluctant to find that the weight of the entire potpourri product should be used to calculate the base offense level. Even if spice is a dangerous product as a mixture—in contrast to marijuana where the effects of THC are mitigated by other chemicals—one defendant's mixture could be more potent than another defendant's mixture. Applying the weight of the

28

whole spice mixture to the base offense level calculation does not address this potential for inconsistent results.

Second, the Court is uncertain that the entire 34.5 kg of spice contains controlled substances. The United States readily acknowledges that one out of the thirteen samples in this case did not contain any controlled substance, [Doc. 154 at 17], and that it was impractical and infeasible to test all samples of spice in this case. [Docs. 131 at 72–3; 132 at 229–30, 254]. While the Court understands the practical limitations against testing the entire stockpile of spice seized in this case, the manufacturing inconsistencies and the presence of one sample containing zero trace of controlled substances suggests that the United States' assessment of the quantity of illegal spice in this case, containing a controlled substance, may not be reliable.

Mr. Abuzuhrieh rightfully underscores that it defies logic to treat the weight of spice, as opposed to a weight of pure synthetic cannabinoid chemical, as pure THC. Indeed, setting aside the established differences in dangerousness between spice and marijuana, the United States' argument "that the weight of the potpourri seized should be treated as if it were pure synthetic THC would be equivalent to taking a bale of marijuana . . . and then computing the defendant's base offense level using the pure THC weight . . . ." [Doc. 183 at 8]. The inappropriateness of treating the entire potpourri mixture as pure THC is underscored by the fact that two other cases involving these same experts calculated the advisory Guidelines range based on a weight of pure synthetic cannabinoid, not a weight of spice product. In *Hossain*, the defendant pleaded guilty to importing 216 kg of pure XLR-11 which, when equated to THC, amounted to 36,072 kg of marijuana and a base offense level of 36. *United States v. Hossain*, 2016 WL 70583, at *4 (S.D. Fl. Jan. 5, 2016). The total offense level was 39. *Id*. Nevertheless, in light of similar concerns about the fairness of applying the 1:167 ratio, the

sentencing court in *Hossain* relied on the § 3553(a) factors to sentence the defendant to 120 months. *Id.* at *5–7.

Similarly, in *Malone*, the two defendants sold both pure AM-2201 and a spice mixture containing AM-2201, but pleaded to distributing 1,400 kg of pure AM-2201, resulting in the highest base offense level of 38. *United States v. Malone*, 828 F.3d 331, 334–35 (5th Cir. 2016). In response to defendants' objections and arguments, the defendants were each sentenced to 117 months. *Id.* at 336. The Fifth Circuit upheld the sentencing court's decisions, saying, in part, that the equivalency was between THC and the synthetic cannabinoid chemical, not between THC and the spice mixture or product. *Id.* at 338 ("[W]e agree with the district court that the assertion that we ought 'compare an isolated chemical with a leafy green substance' seems implausible on its face—an uncertainty here not dispelled. . . . [the record] reflects that the various participants in the conspiracy would have used this quantity of AM-2201 to produce at least twenty times as much [potpourri].").

In this case, not only is Mr. Abuzuhrieh being held responsible for a much smaller weight of 34.5 kg, but he is also only being held responsible for potpourri, and not for any amount of pure controlled substance. In fact, as discussed above, there can be no estimate in this case of the weight of controlled substances contained in the potpourri. Nevertheless, whereas defendants in *Hossain* and *Malone* were sentenced to around 120 months, the base offense level according to the PSR in this case is 32, or 121 to 151 months. The Court is reluctant to find that a base offense level of 32 is appropriate in this case, where other courts have sentenced defendants responsible for six to forty times the weight at issue in *pure* synthetic cannabinoid to sentences at the lower end of this base offense level. Under § 3553(a)(6), the Court seeks to avoid sentencing Mr. Abuzuhrieh in a way that would treat him the same as another defendant

30

responsible for the same weight of pure synthetic cannabinoid.   *See* Doc. 155 at 4–5.

In light of the above uncertainties concerning the quantity of controlled substances at issue, the PSR's recommendation to hold Mr. Abuzuhrieh responsible for 34.5 kg of pure THC would be grossly unjust.   The fundamental concern raised by Mr. Abuzuhrieh's objection is that the United States has not shown why the entire weight of spice should be considered as dangerous as the same weight of pure THC, rather than ascertaining the weight of controlled substances.   Indeed, although Dr. Trecki testified that the carrier medium is inert and, unlike marijuana, likely does nothing to mitigate the effects of the synthetic cannabinoid, Dr. Trecki did not provide a pharmacological explanation for why the weight of the carrier medium should be counted.

Even if the Court were to set aside these concerns, the United States has not offered in this or similar cases any scientific basis for the 1:167 marijuana equivalency ratio for THC.   *See* Doc. 182 at 48 (testimony from Dr. Trecki stating "I wouldn't say that the number is baseless.   I have no reason to doubt it either way, but I do not know where the number came from.   That's what I think I would say for the Court.").   *See also Malone*, 828 F.3d at 335-6 ("Both experts [Drs. Trecki and Cozzi] agreed, however, that there was no scientific basis for the 1:167 ratio used to convert THC into marijuana."); *Hossain*, 2016 WL 70583 at *5 ("Although I asked each of the experts [Drs. Trecki and Cozzi] at the hearing, no one could provide me with a reason for this ratio, which has major implications in determining the base level offense.   After my own research and a phone call to the Sentencing Commission, I still could find no basis for this ratio.").

The 1:167 ratio does not seem to portray even a reasonable estimation of THC content in illegal marijuana.   Dr. Cozzi testified that, practically speaking, marijuana in conformity with

the 1:167 ratio would contain 0.6% THC, "which . . . is so low . . . that this is more typical of industrial hemp . . . used to make hemp cloth, hemp seed oil. You can buy hemp protein . . . So this is the kind of marijuana that is . . . in the sentencing table." [Doc. 182 at 143–44]. The Court is thoroughly baffled that the Sentencing Guidelines would call for a marijuana equivalency ratio for THC that seems to bear no resemblance to the data showing the THC content of marijuana in recent years. As the court stated in *Hossain*, "a sentence based on a range that seems to have no cognizable basis is not just." *Hossain*, 2016 WL 70583 at *5.

The Court finds the 1:7 ratio argued by Dr. Cozzi to be persuasive for purposes of estimating a downward variance. The United States cites *United States v. Hurley*, 842 F.3d 170, 173 (1st Cir. 2016) for its holding that courts cannot amend the Guidelines by applying the 1:7 ratio argued by defense experts. [Doc. 184 at 7]. The Court agrees that its calculation of the advisory imprisonment range under the Guidelines is limited by the terms of the Guidelines. However, the First Circuit in *Hurley* identified a distinct trend among sentencing courts expressing concern that applying the 1:167 ratio to spice cases results in artificially high advisory imprisonment ranges and fails to achieve uniformity in sentencing. 842 F.3d at 173–74 (citing *Hossain* for using the 1:7 ratio as a factor in calculating a downward variance under § 3553(a)). The *Hurley* Court "recognize[d] . . . that applying the 1:167 ratio to a product that, by weight, consists primarily of inert plant matter creates an anomaly, because of the severity of the way this conversion rate works. The anomaly is also reflected in the recommended Guidelines sentence of 292–365 months, which exceeds the 240-month maximum sentence allowed under 21 U.S.C. 841(b)(1)(C)." *Id.* (quoted authority omitted). The First Circuit in *Hurley* even stated that "the lack of either a specific conversion rate or a clear comparator may harm both uniformity and fairness. We therefore believe that the Sentencing Commission should address

32

this issue with greater clarity and provide a rationale." *Id.* at 174.[3]

As in *Hurley* and *Hossain*, this Court is persuaded that a 1:7 THC to marijuana equivalency ratio, based on Dr. Cozzi's presentation of data from the NIDA, should be considered as one factor in calculating a downward variance under 18 U.S.C. § 3553(a). *See Hossain*, 2016 WL 70583 at *6 ("Although I will not rewrite the Guidelines and apply this ratio for THC, this lower ratio is persuasive as to why the current Guideline range fails to provide just punishment for this offense."). Applying a 1:7 ratio, Mr. Abuzuhrieh would be responsible for 241.5 kg of marijuana, which would reduce the base offense level to 24, bringing the total offense level to 26, resulting in an imprisonment range of 63 to 78 months.

This sentence range is more reasonable than the range suggested under the Guidelines. The advisory Guidelines range of 151 to 188 months for 34.5 kg of potpourri would, under the Guidelines, apply also to the same weight of pure synthetic cannabinoid chemical. This Court must take into account, *inter alia*, "the need to avoid unwarranted sentence disparities among similarly situated defendants." § 3553(a)(6). By looking to what the base offense level would be according to a 1:7 marijuana equivalency ratio, the Court arrives at an estimated sentence that is more fitting of the nature and circumstances of the offense. Mr. Abuzuhrieh was an end-distributor of potpourri containing controlled substances. He did not obtain pure synthetic cannabinoid chemicals and manufacture potpourri himself, and he did not distribute spice beyond selling individual packets at his own shop. Although the Court is persuaded that smoking spice can be much more dangerous that smoking marijuana, and that individuals should

---

[3] Mr. Abuzuhrieh argues that because the United States Sentencing Commission has identified synthetic cannabinoid offenses as a subject for further study in 2017, the 1:167 ratio is likely to be amended in the Guidelines. [Doc. 183 at 3]. The Court does not read the Commission's priorities for 2017 as specifically focused on amending the 1:167 ratio, but understands that the present case may, along with many others, inform the Commission's assessment of whether sentencing courts tend to find the 1:167 ratio unfair in practice.

be deterred from manufacturing and selling products containing synthetic cannabinoids, the resulting base offense level under the Guidelines, particularly with respect to a defendant who only possessed potpourri, is artificially high when compared to the seriousness of the offense and the importance of avoiding sentences "greater than necessary" in achieving the purposes of sentencing.   The Court therefore agrees with Mr. Abuzuhrieh that under § 3553(a)(6), "equating the potpourri seized from Mr. Abuzuhrieh to pure THC would treat dissimilarly-situated defendants in an identical manner."   [Doc. 155 at 3].

Regarding the history and character of Mr. Abuzuhrieh, under § 3553(a)(1), the Court is persuaded that Mr. Abuzuhrieh has no prior criminal history and that the instant offense was non-violent.   It would appear that the instant offense was an anomaly in an otherwise law abiding life.

The Court is also persuaded under § 3553(a)(2)(A) and (C) that Mr. Abuzuhrieh and his family may face the collateral consequence of Mr. Abuzuhrieh's deportation, making a lengthy period of incarceration unnecessary to exact sufficient punishment or protect the public from further crimes.   Although the Tenth Circuit has not squarely addressed the issue of whether a sentencing court may consider deportation in support of a downward variance (*but see U.S. Sanchez-Leon*, 764 F.3d 1248, 1263–64 (10th Cir. 2014) (finding that the district court procedurally erred in ruling that deportability was an impermissible factor to consider in support of a downward variance)), there is a clear trend among other circuits considering collateral immigration consequences in support of a downward variance.   *See, e.g.*, *United States v. Gonzalez-Lopez*, 2012 WL 3150350, at *13 (D.N.M., July 27, 2012) (citing the "hardships" that a non-citizen would face as a potential favor in support of a downward variance); *United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014) ("a district court may take into account . . .

34

the impact deportation will have on the defendant and his family"); *Sanchez-Leon*, 764 F.3d at 1264 n.12 (listing other circuit decisions stating that courts may consider deportability as a factor in applying a variance).   If Mr. Abuzuhrieh is deported, his wife and six children will out of necessity return to the West Bank with him.   [Doc. 155 at 13–14].   In their neighborhood of Beit Hanina in East Jerusalem, the family is likely to encounter a woefully inadequate education system, frequent violence and instability, and as Palestinians the family is likely to be treated as second class citizens.   *Id*. at 19–26.   Mr. Abuzuhrieh's eight-year-old son, who suffers from Attention Deficit/Hyperactivity Disorder (ADHD) and autism, will not have access to the special assistance and one-on-one teaching that he needs and has access to in the United States.   [Doc. 155 at 18 n.6].   Considering these tremendous collateral consequences that would not be at stake for a United States citizen defendant, the Court is persuaded that a lengthy sentence of Mr. Abuzuhrieh would be excessive and have no additional impact on public safety.

Finally, under § 3553(a)(2)(B), the Court is persuaded that the loss of Mr. Abuzuhrieh's business and immigration status, along with the incarceration he has already suffered, will adequately deter other smoke shop owners from selling spice products.

## CONCLUSION

For the reasons stated in this memorandum, as to Mr. Abuzuhrieh's Objections to the PSR, the Court finds as follows:   (1) the objection as to the application of the 1:167 marijuana equivalency ratio for purposes of calculating the advisory imprisonment range under the Guidelines is OVERRULED; (2) the objection as to the inclusion of spice seized from Suite H is OVERRULED; (3) the objection as to applying the enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance is OVERRULED; (4) the objection as to applying the enhancement under § 3B1.1(c) for being a

leader or supervisor of criminal activity is SUSTAINED; (5) the objection as to applying the enhancement under § 3C1.1 for obstruction of justice is SUSTAINED; and (6) the objection that Mr. Abuzuhrieh is entitled to a departure under § 5H1.6 is OVERRULED.   Having disposed of Mr. Abuzuhrieh's objections, the base offense level is 32, total offense level 34, and the advisory imprisonment range under the Guidelines is 151 to 188 months.

However, in light of substantial concerns about the fairness of applying the 1:167 ratio in this case, as well as additional factors under § 3553(a), the Court grants a downward variance in order to avoid a sentence that would be greater than necessary in meeting the goals of sentencing.

**IT IS ORDERED** that for the reasons stated in this memorandum and in open Court, the Court sentences Firas Abuzuhrieh to 30 months imprisonment as to each of Counts 1, 3, 4, 5, and 6 of the Superseding Indictment, to be run concurrently, to be followed by 3 years of supervised release as to each of Counts 1, 3, 4, 5, and 6, also to be run concurrently.   If Mr. Abuzuhrieh is deported, the term of release shall be unsupervised.

Dated this 18th day of April, 2017.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE